NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190505-U

NO. 4-19-0505

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 17, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.B., a Minor, | ) | Appeal from |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
|       Petitioner-Appellee, | ) | No. 17JA71 |
|       v. | ) | |
| Robert B., | ) | Honorable |
|       Respondent-Appellant.) | ) | John R. Kennedy, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding the trial court's best-interest finding was not against the manifest weight of the evidence.

¶ 2    In January 2019, the State filed a petition to terminate the parental rights of respondent, Robert B., as to his minor child, A.B. (born September 9, 2016). Following a fitness hearing, the trial court found respondent unfit. In July 2019, the court found it was in A.B.'s best interest to terminate respondent's parental rights.

¶ 3    Respondent appeals, asserting the trial court's best-interest finding was against the manifest weight of the evidence.

¶ 4                  I. BACKGROUND

¶ 5                   A. Initial Proceedings

¶ 6 On December 13, 2017, the State filed a petition for adjudication of wardship, alleging A.B. was neglected pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2016)), in that her environment was injurious to her welfare as evidenced by respondent mother's substance abuse and failure to correct conditions that led to a prior adjudication of parental unfitness. On December 22, 2017, the State filed an amended petition for adjudication of wardship alleging A.B. was neglected because her environment was injurious to her welfare when she resided with respondent in that the environment exposed her to domestic violence. A shelter care report filed that same day indicated that, in October 2017, respondent mother's three older children were taken into the care of the Department of Children and Family Services (DCFS) and A.B. was placed in her paternal aunt's home, where respondent lived. Following a November 2017 hotline report of domestic violence, DCFS took A.B. into protective care and filed the amended petition for adjudication of wardship.

¶ 7 In February 2018, the trial court entered an adjudicatory order finding A.B. neglected. In March 2018, the court entered a dispositional order (1) finding respondent unfit and unable to care for A.B., (2) making A.B. a ward of the court, and (3) placing custody and guardianship with DCFS.

¶ 8 B. Termination Proceedings

¶ 9 In January 2019, the State filed a petition to terminate respondent's parental rights. The petition alleged respondent failed to (1) make reasonable progress toward the return of A.B. during any nine-month period following the adjudication of neglect, specifically from April 1, 2018, to January 1, 2019 (750 ILCS 50/1(D)(m)(ii) (West 2016)); and (2) maintain a reasonable degree of interest, concern, or responsibility as to A.B.'s welfare (750 ILCS 50/1(D)(b) (West 2016)).

¶ 10                              1. *Fitness Hearing*

¶ 11          In May 2019, the matter proceeded to a fitness hearing. The trial court heard the following evidence.

¶ 12                              a. Rachel Kramer

¶ 13          Rachel Kramer, a program director with Lutheran Social Services of Illinois (LSSI), testified she was the supervisor for the case. In April 2018, respondent had not been assessed for services because he failed to complete an integrated assessment. In July and August 2018, Kramer served as the caseworker and had no contact with respondent. Respondent did not provide proof of completion of any services, although he had supervised visitation at that time.

¶ 14                              b. Jaimee Roy

¶ 15          Jaimee Roy testified she was the caseworker from April to May 2018. During her time as caseworker, Roy had no contact with respondent. Roy did not attempt to contact respondent because she had no contact information.

¶ 16                              c. Meredith Brumfield

¶ 17          Meredith Brumfield testified she was the caseworker from August 2018 to May 2019. In August 2018, respondent spoke with Brumfield about completing an integrated assessment. Brumfield gave respondent a new integrated assessment document, which respondent completed and returned the following day. Brumfield followed up with respondent to complete the integrated assessment and set up weekly visits with A.B. After respondent's first visit with A.B., Brumfield did a substance-abuse assessment and referred respondent to Rosecrance to complete a formal assessment. According to Brumfield, she never received documentation indicating respondent completed the formal assessment.

¶ 18    Brumfield testified she referred respondent to Family Advocacy of Champaign County for parenting classes and Cognition Works for individual therapy. Respondent never provided proof of completing the parenting classes or engaging in therapy. Although respondent requested increased visits, Brumfield informed him he had to engage in services first. Brumfield testified she never increased visits because she never received documentation showing respondent engaged in services. Brumfield sent respondent numerous letters trying to get him to engage in services.

¶ 19    Respondent denied being in a romantic relationship with anyone, but a woman who identified herself as respondent's girlfriend answered one of respondent's contact telephone numbers on several occasions. According to Brumfield, there were some issues with getting confirmation of visits before they occurred, and respondent was often late. Respondent's visits became less consistent in October 2018 due to his incarceration. Based on respondent's arrest, Brumfield referred respondent to Cognition Works for domestic-violence treatment. The trial court took judicial notice of respondent's November 2018 conviction for a domestic battery offense in Champaign County case No. 18-CM-1044.

¶ 20                            d. Respondent

¶ 21    Respondent testified he was aware he needed to complete various services, including parenting, domestic-violence, and anger-management classes. According to respondent, he completed a parenting class in 2019 that his probation officer helped set up. Respondent recently started domestic-violence and anger-management classes also set up by his probation officer. Respondent complied with drug tests as part of his probation. Respondent testified he was on probation for a felony domestic battery that occurred in December 2018.

¶ 22        Due to bus schedules, respondent was occasionally late to visits with A.B. Respondent acknowledged missing some visits due to incarceration but testified he did not otherwise miss visits. Respondent testified he worked full-time at McDonald's from May 2017 to January 2018. Respondent lost his job in January 2018, but McDonald's re-hired him approximately one month before the hearing.

¶ 23        Respondent testified A.B. was taken from his home while he was at work and he visited her regularly ever since. According to respondent, he missed only three visits during the pendency of the case. Although respondent had communication problems with the earlier caseworkers, he communicated well with Brumfield.

¶ 24                            e. The Trial Court's Ruling

¶ 25        The trial court noted respondent only engaged in services after his second arrest for domestic battery at the end of 2018. Respondent did not begin those services during the relevant nine-month period even though referrals had been made for parenting classes, substance-abuse assessments, and individual counseling. The court noted that, had respondent engaged in those services, he might have avoided the later domestic battery incidents. The court found respondent failed to engage in any services until after his December 2018 arrest. Accordingly, the court concluded the State proved by clear and convincing evidence that respondent failed to make reasonable progress toward the return of A.B. during the nine-month period from April 2018 to January 2019. The court further concluded that although respondent maintained interest and concern for A.B., he failed to maintain a reasonable degree of responsibility for A.B.'s welfare, as evidenced by his failure to engage in services.

¶ 26                            2. *Best-Interest Hearing*

¶ 27　　　　LSSI submitted a best-interest report indicating respondent became involved with LSSI in August 2018. Respondent "was arrested in November 2018 and in December 2018 and spent time in jail for domestic violence against his girlfriend." In September 2018, respondent completed a substance abuse screen and was referred to Rosecrance for an intake appointment. Respondent failed to engage in this service. LSSI further referred respondent for individual therapy and parenting classes. Respondent also failed to engage in these services. Visitation with A.B. was inconsistent due to respondent's incarceration; however, the visits went well when respondent attended.

¶ 28　　　　According to the report, the foster parents met A.B.'s physical safety and welfare needs, including food, shelter, clothing, and health care. A.B. was well integrated into her foster family and the foster parents were willing to encourage her interests by signing her up for classes and sports. The foster parents ensured A.B. had frequent visits with her older siblings. A.B. had a strong bond with her foster parents, showed them affection, and sought them out to meet her needs. A.B. remained in the foster home since her placement in December 2017 and she had a strong sense of belonging with the foster family. The foster parents were "ready and willing to provide permanency for [A.B.]"

¶ 29　　　　The Court Appointed Special Advocate (CASA) also filed a best-interest report, which documented the stability of A.B.'s foster placement. The CASA report noted the foster family ensured A.B. had contact with her older siblings. A.B. shared a strong bond with her foster family and the report stated, "There is a tremendous risk if [A.B.] were to be uprooted once again from her home and family she has lived with for the last year and a half. [A.B.] feels safe, secure, and loved in her current placement." Both best-interest reports recommended terminating respondent's parental rights.

¶ 30        At the best-interest hearing, the trial court considered the best-interest reports and the statutory factors.  The court agreed with the conclusions drawn in the best-interest reports and stated it was abundantly clear that A.B.'s best interest favored termination of respondent's parental rights.  The court noted respondent had a positive relationship with A.B. and stated, "It is an occasional relationship because of the visitation situation, not a consistent relationship, not one that indicates the ability to provide long-term care for this child."  The court found by a preponderance of the evidence it was in A.B.'s best interest to terminate respondent's parental rights.

¶ 31        This appeal followed.

¶ 32                              II. ANALYSIS

¶ 33        On appeal, respondent argues the trial court's best-interest finding was against the manifest weight of the evidence.  Respondent does not challenge the trial court's finding of unfitness.  Accordingly, we address only the best-interest finding.

¶ 34        Once the trial court determines a parent to be unfit, the next stage is to determine whether it is in the best interest of the minor to terminate parental rights.  *In re Jaron Z.*, 348 Ill. App. 3d 239, 261, 810 N.E.2d 108, 126 (2004).  The State must prove by a preponderance of the evidence that termination is in the best interest of the minor.  *Id.*  The trial court's finding will not be overturned unless it is against the manifest weight of the evidence.  *Id.* at 261-62.

¶ 35        The focus of the best-interest hearing is to determine the best interest of the child, not the parent.  705 ILCS 405/1-3(4.05) (West 2016).  The trial court must consider the following factors, in the context of the child's age and developmental needs, in determining whether to terminate parental rights:

"(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

(d) the child's sense of attachments ***[;]

* * *

(e) the child's wishes and long-term goals;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures and with siblings and other relatives;

(h) the uniqueness of every family and child

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child." *Id.*

¶ 36    The trial court in considering the relevant best interest factors concluded A.B. had the opportunity for long-term care, love, and a family relationship with her foster family. The reports showed A.B. was doing well in her foster placement and had a strong bond with her foster parents. A.B.'s needs were met, and she sought out her foster parents for attention and affection. Moreover, the foster parents were committed to ensuring A.B. had an ongoing

relationship with her older siblings. The CASA report indicated A.B. had a strong sense of belonging with her foster family. Additionally, the foster family was ready and willing to provide permanency for A.B. through adoption. The record shows A.B. was in a stable, loving home with foster parents willing to provide her permanency.

¶ 37   Conversely, respondent cannot provide stability and permanence for A.B. in the near future. Although respondent had a relationship with A.B. and attended visits, he failed to show he could provide, in the near future, permanency. Respondent failed to make reasonable progress toward A.B.'s return in the time the case was pending. Although respondent began some services as part of his probation for a felony domestic-violence conviction, there was no indication that respondent would maintain stability. He failed to engage in services throughout the majority of this case and provided the caseworker with no documentation of engaging in any services. Moreover, respondent's visitation with A.B. was not consistent. He was routinely late for visits and missed several visits due to his incarceration for domestic-violence incidents. The caseworker was never able to increase respondent's visitation or allow for unsupervised visitation because respondent failed to engage in services. Nothing in the record shows respondent might be capable in the near future of offering A.B. a safe, stable, and permanent home. The court determined A.B.'s need for permanence, stability, and security outweighed any harm from terminating respondent's parental rights. Accordingly, the court determined it was in A.B.'s best interest to terminate respondent's parental rights.

¶ 38   Given the extent to which A.B. was thriving in her foster placement and the possibility of permanence and stability in the near future through adoption, we conclude the trial court's finding it was in A.B.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence. Accordingly, we affirm the judgment of the court.

¶ 39                             III. CONCLUSION

¶ 40          For the reasons stated, we affirm the trial court's judgment.

¶ 41          Affirmed.